IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARCUS O'NEAL FLOWERS                                              PETITIONER

VS.                                               CIVIL ACTION NO 3:14cv178-DPJ-FKB

HUBERT DAVIS                                                       RESPONDENT

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Marcus O'Neal Flowers is a state prisoner serving a life sentence for murder. He filed this action seeking federal habeas relief pursuant to 28 U.S.C. § 2254. Having considered the petition, response, and the state court record, the undersigned recommends that habeas relief be denied.

### II. FACTS AND PROCEDURAL HISTORY

On the evening of April 7, 2008, Charles Wash was shot and killed in Newton County near an area of Little I-20 Road occupied by five mobile homes. His body was found in the driver's seat of a truck that had crashed into a wooded area near the homes. Wash had been shot in the face and chest and was dead when law enforcement officials arrived.

A search of the area the next day resulted in recovery of a white sock, a tennis shoe, a white tank top, and a cell phone. Deputy Mark Spence, who participated in the search, had previously been in possession of Flower's cell phone, and he recognized the phone recovered in the search as Flowers's by the screen saver photo of Flowers's

children.   DNA analysis of the tank top indicated that Flowers was the major contributor of DNA to the tank top.

David Hilton, who lived in one of the Little I-20 trailers, gave two statements to law enforcement officials.   Hilton told authorities that that he and Wash had spent the evening of April 7, 2008, together and that Wash had just dropped him off at Little I-20 near his home when Flowers came out of the woods and began shooting at Wash.   In his initial statement, Hilton gave no indication of any involvement in the murder.   In his second statement, given a few days later, Hilton admitted that he had agreed several weeks earlier to help Flowers kill Wash.   He insisted, however, that he had nothing to do with the shooting on April 7, 2008, and that he had been unaware of any intent or plan on the part of Flowers to kill Wash that evening.

Flowers was indicted and tried for murder in the Circuit Court of Newton County, Mississippi.   At trial, law enforcement authorities testified regarding their investigation, and forensics experts testified concerning the bullet wounds to Wash and the DNA testing performed on the clothing found near the murder site.   Hilton testified and identified Flowers as the murderer.   Hilton stated that he and Flowers had worked together for approximately three years doing masonry work for Wash's brother.   He explained that Flowers had wanted to kill Wash because Flowers believed that Wash had "snitched" on him with regard to a drug charge.   On the evening of the murder, Hilton had gone with Wash after work in Wash's truck to a barbecue.   Thereafter, Flowers telephoned Wash requesting that Wash come to Hickory, the town in which Flowers lived.   Wash and Hilton drove to Hickory, and over the course of the evening

Flowers and Wash talked on the phone several times concerning arrangements for delivery of money by Flowers to Wash.  According to Hilton, the money was to be paid to Wash in exchange for Wash's agreement not to testify against an individual known as "Cowboy" in a court proceeding the following day.  At one point during the evening, Flowers directed Wash to go to a certain store in order to meet Flowers's sister for delivery of the payment, but Flowers's sister never showed up.  They also went by Flowers's home, but he was not there.  Ultimately, Wash told Flowers that he could wait no longer and that he was leaving to take Hilton home.  This portion of Hilton's testimony was significant in that it indicated that Flowers knew that Wash would be at the Little I-20 trailers later that evening.

    Hilton testified that once he and Wash arrived at the Little I-20 trailers, Hilton got out of the truck and Wash started to drive away.  However, Wash immediately returned to give Hilton a plate of barbecue that Hilton had left in the truck.  As Hilton was standing by the truck, a man wearing dark clothing and a ski mask came out of a nearby wooded area and called out "Charles Wash."  The man immediately began shooting at Wash, running toward the truck as he fired.  Wash hit the accelerator of his truck and crashed into some trees.  Hilton ran into a trailer and directed the occupant to call 911. He then went back to the truck to check on Wash, who was unresponsive.  Hilton explained that although he could not see the face of the shooter, he recognized him as Flowers by his voice, build, and the way he carried himself.

    Hilton also testified regarding his prior discussions with Flowers regarding Flowers's desire to kill Wash.  Hilton stated that he had agreed to help Flowers lure

3

Wash to an isolated spot where Flowers could shoot him. But Hilton denied any knowledge of Flowers's intent or plan to kill Wash on the evening of April 7.

Vivian Davis, a resident of one of the Little I-20 trailers, testified that Flowers had come to her home approximately 45 minutes prior to the shooting, asking for a candle. Davis did not have a candle, and Flowers left.

Santana Griffin and Cedric Walker were acquaintances of Flowers. They testified that on the night of the murder, Flowers arrived at their home asking for a ride to Hickory. Flowers's pants were badly torn, and he was not wearing a shirt or shoes. He claimed that he had been with a married woman in Scott County that evening when he was discovered by the husband, who began shooting at him. Flowers said he had left in haste without all of his clothing and without his cell phone. Walker allowed Flowers to use his cell phone and gave Flowers a ride home.

Flowers's defense consisted of questioning Hilton's credibility and the plausibility of his story, given the location of Wash's gunshot wounds, and of calling three alibi witness. Latroya Robinson, Flowers's girlfriend, and Martha Flowers, his sister, testified that Flowers had been at home all evening. A neighbor, Laurie Algood, testified that she saw Flowers go out to his car around 10:15 p.m. and that his car was at home all evening. Flowers did not take the stand.

The jury convicted Flowers, and the court sentenced him to serve a term of life imprisonment. The Mississippi Supreme Court affirmed his conviction and sentence. *Flowers v. State*, 156 So. 3d 805 (Miss. 2013). Flowers later filed in the supreme court

an application to proceed in the trial court with a motion for post-conviction relief. The supreme court denied relief on the merits.

Flowers then filed his petition in this court, raising six grounds for relief:

1. DNA testing would prove his innocence.

2. Defense counsel and the prosecutor failed to comply with an order of the court that would have resulted in the discovery of exculpatory and favorable evidence.

3. The state engaged in prosecutorial misconduct by failing to comply with the order of the trial court regarding Calvin Ruffin.

4. The in-court identification of Flowers by Hilton was unreliable.

5. Flowers was denied effective assistance of trial and appellate counsel.

6. Cumulative error deprived Flowers of his right to due process and a fundamentally fair trial.

### III.  ANALYSIS

Flowers's claims were adjudicated on the merits by the Mississippi Supreme Court in his post-conviction proceeding. They are therefore subject to the highly deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of Flowers's claims involved "an unreasonable application of . . . clearly established Federal law . . . as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts" in light of the evidence presented to the state court.  28 U.S. C. § 2254(d).  The Supreme Court has repeatedly emphasized that " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)

5

(quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411.  Rather, the application must be not only incorrect but also "objectively unreasonable."  *Id.* at 409.  Under this deferential standard, federal relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**A.   Ground One: DNA Testing**

In ground one, Flowers contends that additional DNA testing should be performed, as such testing would prove his innocence.  This allegation fails to state a ground for habeas relief.  Whether or not Flowers is entitled to additional DNA testing is solely a question of state law, specifically, Miss. Code Ann. § 99-39-5.  The state supreme court, in rejecting this request, concluded that he did not meet the standard required by the statute. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

Furthermore, Flowers's premise that additional testing would prove his innocence is contrary to the record.  The evidence at trial established the following.  As part of the investigation, authorities obtained a blood sample.  Joseph Heflin, a forensic biologist at the state crime lab, used the sample to make a stain card, and William Jones, a DNA analyst at the crime lab, obtained a DNA profile for Flowers from the stain card.

Serological testing on stained areas of the sock was negative for blood, but areas of the tank top tested positive. Cuttings were then made from the portions of the tank top testing positive for blood and were subjected to DNA analysis. According to Jones, no DNA profile could be obtained from the cuttings.

The sock, the cuttings, and the remaining portion of the tank top were then sent out to a private laboratory specializing in DNA analysis. Dr. Bo Scales, the owner and director of the laboratory, explained that his lab likewise determined that there was no blood on the sock. Dr. Scales's lab was also unable to obtain a DNA profile from the cuttings. However, swabbings from the inside seams of the intact portion of the tank top resulted in recovery of epithelial cells, from which the lab successfully obtained a DNA profile. According to Dr. Scales, the DNA profile contained more markers than could be attributed to a single individual. However, the DNA markers of the major contributor of DNA matched the markers for Flowers. Scales opined that the major contributor had worn the shirt.

The DNA evidence presented at trial established a connection between Flowers and the tank top found near the crime scene. Flowers has not offered any plausible theory as to how additional testing would disprove this connection or would otherwise cast doubt on his guilt.

**B.   Grounds Two and Three: The Trial Court's Order Regarding Calvin Ruffin.**

Grounds two and three relate to Flowers's contention that an individual by the name of Calvin Ruffin may have had information regarding the crime and could possibly be the murderer. Prior to the originally-set trial date of December 1, 2008, defense

7

counsel filed a motion for continuance, stating that he had only recently received supplemental discovery and had not had adequate time to prepare for trial.  At the hearing on the motion, defense counsel explained that he had learned of the existence of a possible witness, Calvin Ruffin, by listening to Hilton's recorded statement that was included in the supplemental discovery   Defense counsel explained that in the statement, Hilton indicated that Ruffin was to pay money to Flowers, who was then to transfer it to Hilton in exchange for Hilton's refusal to appear in a court proceeding.

Apparently neither defense counsel nor the prosecution had an address for Ruffin at the time of the hearing, although the sheriff, who was present at the hearing, stated that he believed Ruffin to be in Florida.  The court granted the continuance and directed the lawyers to either issue a subpoena for Ruffin to testify at trial or to furnish the judge a written statement as to Ruffin's availability and the reason no subpoena had been issued.  The trial court docket sheet indicates that a request to issue a subpoena for Ruffin was filed on December 24, 2008.  The record contains no further reference to Ruffin.  No return of the subpoena was filed, he was not identified by the defense as a trial witness, and there was no mention of him at trial.

Flowers argues that he is entitled to habeas relief because of the failure of defense counsel and the prosecutor to have a subpoena issued for Ruffin.  But a subpoena was in fact issued for Ruffin; thus, there was no failure to abide by the court's order.  Furthermore, there is nothing in the petition or in the record to suggest that the failure of Ruffin to appear and testify somehow violated Flowers's right to compulsory process or any other constitutional rights.  Flowers has come forward with nothing to

establish what Ruffin's testimony would have been or that it would have been favorable to his defense. He says only that Ruffin "may have information valuable to the defense of which information could establish that Calvin Ruffin could have killed Mr. Wash," [1] at 7, and that Ruffin's testimony "would have probably led to sufficient evidence to support the defense," [1-1] at 12. Flowers's conclusory allegations in grounds two and three fail to raise a ground for habeas relief.

C. Ground Four: In-court Identification by Hilton.

Flowers argues in ground four that Hilton's in-court identification of Flowers as the killer was unreliable. He points out that Hilton testified that the killer was wearing a ski mask and that it was dark at the time of the shooting. Flowers also points out that there was evidence that immediately after the shooting, Hilton indicated that he did not know the identity of the shooter.[1] In his state court motion for post-conviction relief, he also contended that Hilton's testimony was inconsistent with his initial recorded statement, in that Hilton testified that the killer called out Wash's name, whereas Hilton indicated in his initial statement that the killer had not spoken.

This ground for relief amounts to no more than a challenge to the evidence. Hilton testified that he had known and worked with Flowers for approximately three years, and his identification of Flowers as the shooter was based upon his prior relationship with Flowers and his familiarity with Flowers's voice, build, and

---

1 Jessica Alcorn lived in the first Little I-20 trailer. Immediately following the shooting, Hilton ran into Alcorn's trailer and told her to call 911. Alcorn testified that when she asked Hilton who the shooter was, he responded that he did not know.

mannerisms. Defense counsel cross-examined him on his identification. The jury was entitled to hear Hilton's testimony and give it whatever weight they deemed appropriate.

A slightly different take on this argument is contained in Flowers's state court motion for post-conviction relief. There, Flowers cited to *Neil v. Biggers*, 409 U.S. 188 (1972), a case involving suggestive pretrial identification procedures, in support of this ground for relief. *Neil* and the line of cases involving suggestive pretrial identification procedures are inapplicable, as the present case involved no pretrial identification procedure. Rather, Hilton's in-court identification of Flowers as the shooter was based upon his relationship and familiarity with Flowers. The state court's rejection of this ground for relief was reasonable, and no relief is warranted.

**D. Ground Five: Ineffective Assistance of Counsel.**

In ground five, Flowers contends that his attorneys rendered ineffective assistance. Analysis of ineffective assistance claims begins with the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires that a petitioner show that his counsel's performance was deficient and that the deficiency resulted in prejudice to the defense. Furthermore, when § 2254(d) applies, the question is not whether counsel was ineffective under *Strickland.* Rather, the reviewing court must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Flowers argues that his trial counsel was ineffective for failing to subpoena

Calvin Ruffin and that his appellate counsel should have included this ineffective assistance claim in his assignments of error on direct appeal. As explained supra, this allegation is based upon an incorrect factual premise, as a subpoena was issued for Ruffin. To the extent that Flowers is arguing that his trial attorney did not do enough to try to locate Ruffin, this claim fails for lack of specificity. Flowers does not state what more his attorney could have done or what evidence would have resulted from further efforts to locate Ruffin or to have him called as a witness. "To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F. 3d 356, 361 (5th Cir. 2005). Furthermore, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). Flowers's vague, speculative allegations fall far short of the specificity required for establishing either deficient performance or prejudice under *Strickland*. Because a reasonable jurist could conclude that the state court's rejection of this claim was a reasonable application of *Strickland*, no relief is available.

### E. Ground Six: Cumulative Error.

Finally, Flowers argues that his constitutional rights were violated by cumulative error. Federal habeas relief is available for cumulative errors only where those errors are of constitutional magnitude. *Livingston v. Johnson,* 107 F.3d 297, 309 (5th

11

Cir.1997). Flowers has identified no errors that amounted to a violation of his constitutional rights. Thus, there is nothing to cumulate. Accordingly, the state habeas court's rejection of Flowers's cumulative error claim was objectively reasonable, and relief is unavailable.

## IV.  CONCLUSION

Flowers has failed to establish that the state court's adjudication of his claims was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or was based upon an unreasonable determination of the facts. Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 23rd day of January, 2017.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE